UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 06-20592-CR-JORDAN/TORRES

UNITED STATES OF AMERICA,

    Plaintiff,

v.

EMILIO GOMEZ,

    Defendant.
_____/

### REPORT AND RECOMMENDATION ON
### EMILIO GOMEZ'S MOTION TO DISMISS INDICTMENT

This matter comes before the Court on Defendant Emilio Gomez's Motion to Dismiss Indictment [D.E. 59]. The Court has reviewed the motion, the response and exhibits attached thereto and the record. It is recommended that Emilio Gomez's Motion to Dismiss Indictment be denied for the reasons set forth below.

### I.  BACKGROUND

In August 2006, law enforcement officers assigned to an ATF task force received information from a confidential source (CS-1) that co-defendant Nelson Pena and others were committing home invasion robberies in the Miami-Dade area. The investigating officers instructed CS-1 to tell Pena that he knew a cocaine trafficker who was interested in finding persons who could rob a rival drug dealer. After Pena indicated that he was interested, C-1 introduced Pena to a second confidential source (CS-2).

The first meeting between Pena and CS-2 occurred on August 25, 2006. During that recorded meeting, CS-2 pretended to be a cocaine trafficker. CS-2 told Pena that a former colleague in the drug business developed his own delivery route for loads of cocaine. CS-2 stated that he was looking for a crew that could steal a load of cocaine that

his former colleague was transporting through Miami in a tractor-trailer manned by two persons. CS-2 further indicated that he could tell Pena where the truck would be in about two weeks. In response, Pena told CS-2 that he was interested in committing the robbery. During the conversation, Pena stated that he knew some men who were interested and would be good for the job. Pena represented that the men had equipment, including walkie-talkies and pistols. Pena and CS-2 exchanged telephone numbers so that they could stay in touch.

On August 31, 2006, CS-2 and Pena met a second time to further discuss the planned robbery. During that meeting, CS-2 indicated that he believed the tractor-trailer would contain 75 to 80 kilograms of cocaine, which would be stored in the cabin or in a fake compartment in the rear of the truck. CS-2 and Pena agreed to split the load in half, i.e., one-half would go to Pena and his associates and the other half to CS-2. CS-2 represented that he would provide a share of his half of the cocaine to CS-1 as a referral fee. During the meeting, Pena told CS-2 that he only needed to know the location of the truck. Pena also informed CS-2 that he was planning on using three men for the job.

On September 5, 2006, Pena introduced CS-2 to Defendant Emilio Gomez and co-defendant Reynaldo Aviles. That same day, Gomez, Aviles and Pena discussed the plan in detail, asking CS-2 several questions regarding the quantity of the cocaine, its hiding location, the number of people who would be with the truck, and the likelihood of those people being armed. CS-2 answered that he expected the truck to arrive during the next several days, but it would only remain in Miami a short period of time. CS-2 indicated that the two persons transporting the load would sleep in the trailer. Gomez agreed to commit the robbery. Gomez told CS-2 that he and his colleagues would study the tractor-trailer's location to corroborate the information learned so far. Gomez also provided CS-2 details regarding how the group planned to execute the robbery. For example, Gomez told

CS-2 that the group would go dressed in police uniforms.

The robbery was ultimately scheduled to take place on September 6, 2005. That afternoon, Pena and Aviles met with CS-2 to finalize the plan. CS-2 told both co-defendants that the truck would arrive with the cocaine that evening and that he expected that the drivers would sleep inside the truck until early morning. In the morning, other people would arrive to load furniture onto the truck as a cover for the load of cocaine. Pena and Aviles agreed to stay close that evening so that they could move in promptly with the rest of the crew once the truck's final location was established.

That evening, Gomez, Aviles and Pena met CS-2 at approximately 11:00pm. CS-2 then drove them to a warehouse parking lot and showed them the parked undercover tractor-trailer. Gomez, Aviles and Pena indicated that they were satisfied and returned to their vehicle. The three men told CS-2 that they were going to get their equipment and left the area.

After a short period of time, Gomez, Pena, Aviles, and three other men returned to the area. The six men were driving three vehicles, each of which sped onto the parking lot and stopped near the parked tractor-trailer. Co-defendant Joe Guevara and Jorge Torres exited the vehicle closest to the tractor-trailer and approached the truck. Guevara and Torres were wearing shirts marked "DEA" and "FBI." They approached the tractor-trailer quickly, armed with handguns, yelling "DEA" and "FBI." They opened the cabin door. While Guevara and Torres entered the tractor-trailer, a third person wearing a police shirt, Mario Bachiller, remained next to their car and the other three defendants remained next to, or inside of, their parked cars.

At that time, police officers attempted to arrest all six individuals. Four defendants were arrested without incident. Guevara and Torres were shot when they failed to comply with police demands. Torres died at the scene.

In addition to the two firearms carried by Guevara and Torres, a loaded shotgun was found in the back of their vehicle. A search of the arrest scene and the defendants' vehicles resulted in the recovery of walkie-talkies, flex cuffs, cellular telephones and other items of evidentiary value. Gomez, Aviles, Pena and Torres all provided post-arrest statements admitting that they were attempting to commit a robbery at the time of their arrest.

## II.   LEGAL STANDARD

Outrageous government conduct is a recognized legal defense. *United States v. Haimowitz*, 725 F.2d 1561, 1577 (11th Cir. 1984) (citing *United States v. Russell*, 411 U.S. 423 (1973)). To successfully invoke this defense, a defendant must show that the government's actions violated "'that fundamental fairness, shocking to the universal sense of justice,' mandated by the due process clause of the fifth amendment." *Id.* The existence of outrageous governmental conduct is determined from the totality of the circumstances. *Id.* (citing *United States v. Tobias*, 663 F.2d 381, 387 (5th Cir. 1981)). There is no single controlling factor. *Id.* The Eleventh Circuit has previously noted that this defense "can only be invoked in the rarest and most outrageous circumstances." *Id.* Whether the government's conduct was outrageous is a question of law for the Court to determine. *United States v. Savage*, 701 F.2d 867, 868 n.1 (11th Cir. 1983).

## III.   ANALYSIS

Defendant contends that the government's conduct in regard to the reverse sting was so outrageous and unconscionable that it violated his due process. Although this Circuit recognizes that a conviction may be overturned where government involvement in criminal activities is so extensive that it may be characterized as outrageous, "government involvement in criminal activities is constitutionally impermissible only where it violates fundamental fairness and shocks the universal cause of justice." *United States v. Walther*,

867 F.2d 1334, 1339 (11th Cir. 1989). The Court finds that the government's conduct did not rise to such a level as to be called outrageous.

Although the government was extensively involved in the criminal activities of this case, the Eleventh Circuit has refused to dismiss indictments under circumstances very similar to the ones presented here. For example, in *United States v. Walther*, the defendants were convicted of attempting and conspiracy to possess marijuana with intent to distribute. 867 F.2d at 1338. Upon a tip from a confidential informant that individuals from Miami, Florida, were interested in purchasing narcotics, the police devised a plan whereby they would pose as marijuana traffickers. *Id.* at 1335. Similarly, a tip from CS-1 alerted law enforcement officials of Pena and his co-defendants' home invasion robberies.

In *Walther*, undercover police officers posed as sellers of previously confiscated drugs, arranged deals with prospective buyers under controlled conditions, and arrested the purchasers following the sale. *Id.* The officers initiated the negotiations, provided the location for the transaction, and provided the transportation for the narcotics, supplied the narcotics, and even provided defendants transportation to and from the warehouse where the marijuana was located. *Id.* at 1336-39. In this case, police officers also initiated the negotiations, provided the location for the transaction, and provided the tractor-trailer that supposedly contained the cocaine. In *Walther*, prior to the transaction commencing, police officers installed videotape equipment and hidden microphones in the warehouse. *Id.* at 1335. Police officers in this case were also monitoring Defendants.

Arguably, the police were not as involved in the criminal activities of this case as they were in *Walther*. For example, the police in this case did not actually provide narcotics to the Defendants. They also did not provide any sort of transportation either of narcotics or of the defendants involved. As already noted, they did initiate negotiations,

provide the location for the transaction, and secured the place before the operation was carried out. As evidenced by *Walther*, however, these factors are insufficient to find the government's conduct so outrageous and unconscionable that it violated Defendant's due process rights. Another factor weighing against Defendant's argument is that he was brought into the scheme by a co-defendant and not by the government or its confidential informant. *See United States v. Haimowitz*, 725 F.2d 1561, 1577 (11th Cir. 1984).

### III.   CONCLUSION

Accordingly, it is hereby **RECOMMENDED** that Defendant Emilio Gomez's Motion to Dismiss Indictment [D.E. 59] be **DENIED**.

Pursuant to Local Magistrate Rule 4(b), the parties have ten days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Joan A. Lenard, United States District Judge. *See* S.D. Fla. Local Mag. Rule 4. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 30th day of March 2007.

_____
EDWIN G. TORRES
United States Magistrate Judge

Copies provided to:
Honorable Adalberto Jordan
Counsel of record